AO 91 (Rev. 08/09) Criminal Complaint

# UNITED STATES DISTRICT COURT
for the
Eastern District of Virginia

| | |
|---|---|
| United States of America<br>v.<br><br>HEATHER ELIZABETH COFFMAN<br>_____<br>*Defendant(s)* | )<br>)<br>) Case No. 3:14MJ 369 (DJN)<br>)<br>)<br>) |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of __November 13, 2014__ in the county of __Henrico__ in the __Eastern__ District of __Virginia__, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1001(a) | Making a materially false statement or representation regarding an offense involving international or domestic terrorism |

This criminal complaint is based on these facts:

☒ Continued on the attached sheet.

Reviewed by AUSA/SAUSA:

Mike Gill, AUSA

_____
*Complainant's signature*
SA Odette D. Tavares, FBI
_____
*Printed name and title*

Sworn to before me and signed in my presence.

Date: November 14, 2014

/S/
David J. Novak
United States Magistrate Judge
_____
*Judge's signature*

City and state: __Richmond, Virginia__

Hon. David J. Novak, U.S. Magistrate Judge
_____
*Printed name and title*

IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

Richmond Division

| | |
|---|---|
| UNITED STATES OF AMERICA )<br>)<br>v. )<br>)<br>HEATHER ELIZABETH COFFMAN, )<br>)<br>Defendant. ) | CRIMINAL NO. 3:14MJ 369 (DJN) |

## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

I, ODETTE D. TAVARES, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1. I make this affidavit in support of a criminal complaint charging HEATHER ELIZABETH COFFMAN with false statements involving or promoting international and domestic terrorism, in violation of 18 U.S.C. § 1001(a).

2. I am a Special Agent with the Federal Bureau of Investigation, assigned to the Richmond Field Office. I have been a Special Agent of the FBI for approximately ten years and currently am assigned to the Richmond Field Office, Joint Terrorism Task Force (JTTF). I have training and experience in the preparation, presentation, and service of criminal complaints and arrest and search warrants, and have been involved in the investigation of numerous types of offenses against the United States, including crimes of terrorism.

3. The facts and circumstances contained within this affidavit are based upon my personal investigation, as well as reports made to me by other law enforcement agents or U.S. Government personnel. This affidavit is intended to show that there is sufficient probable cause

to support the issuance of the requested warrant and does not set forth all of my knowledge about this matter.

4. Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that on or about November 13, 2014, COFFMAN did knowingly make a materially false statement involving or promoting international and domestic terrorism, in violation of 18 U.S.C. § 1001(a).

## BACKGROUND

5. Investigation shows that HEATHER COFFMAN of Henrico Virginia, is suspected of conspiring and attempting to provide material support to the Islamic State of Iraq and al-Sham ("ISIS") a foreign terrorist organization. During the course of the investigation, law enforcement has, among other things, gathered information from Facebook Account postings by COFFMAN and some of her confederates, as well statements made by COFFMAN to an FBI undercover agent.

6. **Facebook Account Activity:** The investigation has shown that COFFMAN has used several Facebook accounts with numerous variations of monikers, to include but not limited to: HEATHER COFFMAN, HEATHER LA'AHAD, HEATHER OBEIDA-LA'AHAD, HEATHER AMETOVA and UBEIDA AMETOVA (collectively referred to below as COFFMAN).

7. A search warrant, issued in the United States District Court for the Eastern District of Virginia on August 4, 2014, was served to Facebook on August 4, 2014. Included within the scope of that search warrant were a number of accounts connected directly to COFFMAN.

Below is a synopsis of some of the probable cause used to obtain the search warrant on the accounts above.

8.  **Subject Account 1 (\*\*\*\*\*\*\*\*\*\*5178):** COFFMAN using the moniker UBEIDA AMETOVA (Heather La'Ahad) on June 23, 2014 listed COFFMAN's "Work and Education" as "Al-jihadi fi Sabil Allah" which translates as "jihad for Allah's sake." **Subject Account 1** was closed. It is unknown when it was shut down or the reason for it. The following is a description of the images on **Subject Account 1** as were displayed on June 23, 2014:

   a. Observed on June 23, 2014 were two images with the word "WE ARE ALL ISIS, ISLAMIC STATE OF IRAQ & SHAM" on them.

   b. Observed on June 23, 2014 was an image of group of armed men, with the "VIRTUES OF THE MUJAHIDEEN" written on it. The black flag in that picture represents ISIS. Written at the bottom is: "Allah has preferred the Mujahideen over those who remain [behind] with a great reward. Degrees from Him and forgiveness and mercy. And Allah is ever Forgiving and Merciful." On the left hand side of this image (not displayed due to this image being cropped) has written The Islamic State of Iraq & Sham (ISIS). In my experience, this indicates support for violent jihad. Further, the mujahideen are individuals that fight violent jihad.

   c. The term "jihad" has two meanings. It is used by some to refer to personal struggle in the way of Allah. When used by counterterrorism subjects, it often means "holy war" – fighting against the enemies of Islam. In that context, jihad refers to the use of violence, including paramilitary action against persons,

property or governments deemed to be the enemies of fundamentalist version of Islam.

9. **Subject Account 2 (***********5986):** COFFMAN, using the moniker UBEIDA AMETOVA (Heather Ametova) displayed some of the following images on **Subject Account 2** on July 8, 2014:

   a. Four images with the word "ISIS" on them; two of these images are the same as observed on **Subject Account 1**.

   b. An image of a group of armed men, with the "Virtues of the Mujahideen" written that was also posted on **Subject Account 1** (described in paragraph 8(b)).

   c. An image of the ISIS flag in the middle with men on either side praying and holding AK-47s.

10. **Synopsis on Content of Search Warrant Returns:** On August 19, 2014, Facebook provided the information requested from the above listed accounts up to and including the date August 06, 2014. Below are some examples taken from each account as reviewed:

   a. **Subject Account 1 (***********5178):**

      i. On June 28, 2014, User ***********7455 (name in Arabic, hereafter referred to as 7455) asked why COFFMAN posts pro-ISIS pictures. COFFMAN replied, "I love ISIS!" She later stated that "They keep deleting my accounts because of it."

      ii. On June 28, 2014, 7455 and COFFMAN continued to discuss ISIS; 7455 said "because all world think isis is terrorist : (" COFFMAN replied, "I know…it's all Zionist propaganda though! If we can rid the world of them…then the world will be a better and peaceful place." Later

4

> COFFMAN, in reference to her sister, wrote "She know ISIS because I told her about them and got her into liking them lol"..."my dad is a little angry because I got her into all this jihad stuff."

b. **Subject Account 2 (***********5986):**

   i. On July 25, 2014, a confederate referred to hereafter as N.A., with whom Coffman claimed to be married to, posted that he hoped their future son will be "Mujaheeden." COFFMAN said this son would "go with" N.A. and that COFFMAN supports N.A. "whutever you want to do."

   ii. On July 30, 2014, COFFMAN told N.A. that she hates gays and Zionists and that "they should all die."

   iii. On July 29, 2014, COFFMAN told N.A. to not put pro-ISIS statuses on Facebook because "they don't let you come" and that "the NSA has already seen it."

11. Aside from the above accounts, several other Facebook accounts have been identified as COFFMAN's and contain similar postings, including those described in the following paragraphs.

12. **Subject Account 6 (***********2921):** This is an account that COFFMAN has had since the initiation of the investigation in April 2014. The monikers on this page have changed a number of times, including the names HEATHER LA'AHAD and HEATHER COFFMAN. She is careful about what she posts on this account. On September 2, 2014, COFFMAN told a CHS that she: "had [her] actual real Facebook account that [she's] had since 2009, um, but then, they started wanting like, photos and things, like with Habaaz (?) and all them, but I don't want to offend anybody, so I made a separate account where I could do that."

5

Most of the posts on this account are private. As of 10/02/2014, COFFMAN had her location on this account set to Hafsarjah, Idlib, Syria.

13. **Subject Account 7 (\*\*\*\*\*\*\*\*\*\*1365):** COFFMAN using moniker HEATHER OBEIDA- LA'AHAD (Lady Altairzio), transitioned from her **Subject Account 2** (\*\*\*\*\*\*\*\*\*\*\*5986), to a more radicalized page. Below are screen shots obtained on 05/01/2014:

   a. COFFMAN's Facebook cover page:

   

   b. COFFMAN's photos section:

   

14. **Contacts with FBI Undercover Agent (UC):** Since July 2014, an FBI employee, acting in an undercover capacity (hereinafter "UC"), has been in contact with, and met with, COFFMAN on a number of occasions. UC has portrayed UC as someone who is knowledgeable about Islam and a likeminded individual, sharing similar views as COFFMAN. UC has also

portrayed that UC has an associate who shares the same Islamic views and is prepared to travel to Syria to join and fight for ISIS.

15. In connection with the meetings described below and others, COFFMAN described to UC how she had previously taken steps to arrange for N.A.'s travel to a country bordering Syria, where he (N.A.) would meet with ISIS facilitators. Those facilitators, in turn, were to arrange for N.A.'s training and travel into Syria in order to join ISIS as a fighter and die a "shaheed." Through these meetings, COFFMAN indicated that she had legitimate ISIS facilitator contacts, capable of arranging for training and entry into Syria to join the ISIS cause. Further, COFFMAN described concrete steps she had taken to make those arrangements for N.A. She also indicated that she was prepared to provide N.A. with money to facilitate his travel to join the ISIS cause. After COFFMAN and N.A. split up, COFFMAN expressed frustration to the UC at how N.A. had withdrawn from the ISIS opportunity. For instance, COFFMAN has sent UC a number of Facebook and text messages, including the communications detailed further below referring to COFFMAN'S assistance for N.A.'s travel and how she (COFFMAN) was upset with him for backing out of the opportunity:

    a. On September 22, 2014, COFFMAN sent UC messages that stated words to the effect of: "I want him (referring to N.A.) in Syria and I want him die as a shaheed" and "If I don't marry a mujahid or one with intentions to become one . . . then my husband is a nothing." At this time, COFFMAN and N.A. were in the process of separating.

    b. On October 3, 2014, COFFMAN sent UC a message that stated words to the effect of: "That's whut I told him . . . but now he realizes he is bad and he is the sad one . . . but believe me [UC]. . . . I'm not happy either . . . and he won't go

7

there ... I gave him every opportunity to go there remember? I set him up with the brothers who gave him a contact name and number in Turkey to get him across the border when it was time for training ... I spoke to another brother about it who said he was shocked he (referring to N.A.) is sitting around waiting in Macedonia and he is going to call the emir and fix that and get him to Turkey ... but my account was disabled so I couldn't follow through with that. But I think he (referring to N.A.) was just joking us about going."

16. On October 19, 2014, UC shared with COFFMAN that UC's associate wanted to join the fight for ISIS and that they planned to move to the Islamic State. UC expressed concern about UC's associate's desire to become a "shaheed" or martyr. COFFMAN encouraged UC to support UC's associate's plans. UC also explained to COFFMAN that UC would be travelling overseas in the very near future to visit an ill family member and test the routes into Syria and find a contact to help with crossing the border and joining ISIS. COFFMAN offered to help by contacting a facilitator on behalf of UC, but UC declined the offer and explained that UC wanted to personally explore the options during UC's upcoming overseas trip.

17. On November 5, 6, and 7, 2014, UC met face-to-face with COFFMAN in an undercover capacity. On November 5, 2014, COFFMAN picked UC up at the Richmond International Airport. COFFMAN believed that UC had recently returned from UC's overseas trip referenced in the previous paragraph. COFFMAN drove UC to a local hotel, where they met in private in a hotel room. During that recorded meeting, UC described a trip UC had recently taken to test the route into Syria to join ISIS. UC reported that UC found a good route up to the border of Syria, but that UC could not find contacts on the Syrian side capable of hooking UC and UC's associate up with ISIS in Syria.

8

18. During the November 5 meeting, COFFMAN offered her contacts to UC, with the goal of facilitating UC and UC's associate's travel into Syria to join the ISIS fight. At the end of the meeting, COFFMAN told UC that she would vet the facilitator to make sure he is legitimate, thereby assuring UC's safe passage into Syria to join ISIS. COFFMAN described part of the vetting process as using a computer search of images sent to her by the facilitator to determine if the pictures are authentic originals, as opposed to photos that an imposter copied from internet open sources in an effort to appear legitimate. After COFFMAN verified the facilitator as legitimate, she told UC she (COFFMAN) would then reach out to him on UC's behalf to begin the process.

19. On November 6, 2014, UC met with COFFMAN at her (COFFMAN'S) personal residence. COFFMAN told UC that she had good news and bad news. The good news was that COFFMAN'S facilitator contact passed her vetting process. Also, COFFMAN showed UC a WhatsApp[1] message that COFFMAN had sent to the facilitator advising that she had a friend who was looking to travel into Syria with UC's associate. The bad news was that the facilitator had not responded. Nonetheless, COFFMAN told UC that WhatsApp information showed that the facilitator had been on WhatsApp as recent as November 3. COFFMAN also indicated that she had previously communicated with the facilitator on a Facebook account that had been disabled. COFFMAN described how she tried to revive the Facebook account with a TracFone[2],

---

[1] WhatsApp Messenger is a proprietary, cross-platform instant messaging subscription service for smartphones and selected feature phones that uses the internet for communication. In addition to text messaging, users can send each other images, video, and audio media messages.

[2] TracFones are a brand of prepaid wireless telephones that do not require contracts or subscription services.

9

but was unsuccessful. COFFMAN indicated that she was still waiting for the facilitator to respond.

20. On November 7, 2014, COFFMAN and another individual identified herein as "K.C." met UC in a hotel room. COFFMAN told UC that she (COFFMAN) did not want to provide UC with the facilitator's contact information because she wanted communications to go through her (COFFMAN). She also requested that UC compile a list of questions for the facilitator. In response, UC provided a list of questions, which included UC's planned travel into Syria, specific border crossing points, individuals in a position to help UC, and other information. Also during the November 7 meeting, COFFMAN, K.C. and the UC developed a code word system to communicate on line or by phone about the facilitator to avoid law enforcement detection. COFFMAN told UC that when she makes contact with the facilitator, COFFMAN would "sneeze" in a text message. Then, UC would acknowledge by saying "Alhamdulillah."

21. **November 13, 2014 Interview of COFFMAN:** On November 13, 2014, two FBI special agents interviewed COFFMAN at her place of employment in Glen Allen, Virginia. During the interview, COFFMAN provided false, material information to the federal agents, to include:

    a. COFFMAN was asked whether UC supported ISIS or Al-Qaeda. COFFMAN told the FBI special agents "We don't talk about things like that."

    b. COFFMAN was also asked whether the UC "ever expressed any support for ISIS or . . . any terrorist groups or Hammas, and . . . Hezbollah, al-Qa'ida, nothing like that?" COFFMAN responded by saying "uh uh" and shaking her head no. Agents followed up by asking "again, going through the same list of

questions, is she in contact with anybody that is?" COFFMAN responded "Not that I'm aware of."

c. In truth and fact, in connection with the meetings described above (paragraphs 17-20), COFFMAN and the UC had discussed their support for ISIS and other terrorist organizations. COFFMAN also offered her contacts to UC, with the goal of facilitating UC and UC's associate's travel into Syria to join ISIS.

22. At the end of the interview, FBI special agents told COFFMAN that lying to a federal agent is a crime. COFFMAN confirmed that everything she had said on November 13, 2014, was true.

## CONCLUSION

23. Based on the forgoing, your affiant submits there is probable cause to believe that on or about November 13, 2014, within the Eastern District of Virginia and elsewhere, HEATHER ELIZBETH COFFMAN did knowingly make a materially false statement connected to offenses involving international and domestic terrorism, in violation of 18 U.S.C. § 1001(a).

Respectfully submitted,

Odette D. Tavares
Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before me on November 14, 2014.

/S/
David J. Novak
United States Magistrate Judge

David J. Novak
United States Magistrate Judge

11