IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA



Richmond Division

| UNITED STATES OF AMERICA | ) | |
|---|---|---|
| | ) | |
| v. | ) | Criminal No. 3:15CR016 (JAG) |
| | ) | |
| HEATHER ELIZABETH COFFMAN, | ) | |
| | ) | |
| Defendant. | ) | |

## STATEMENT OF FACTS

The United States and the defendant, HEATHER ELIZABETH COFFMAN, agree that the allegations in Count One of the Criminal Information and the following facts are true and correct, and that had this matter proceeded to trial, the United States would have proven each of them beyond a reasonable doubt:

1. That on or about November 13, 2014, HEATHER ELIZABETH COFFMAN, did willfully and knowingly make a materially false, fictitious, and fraudulent statement involving international terrorism, in a matter within the jurisdiction of the executive branch of the Government of the United States. COFFMAN told Federal Bureau of Investigation Special Agents, in the Eastern District of Virginia, that she had no idea when asked whether an individual referred to herein as "N.A." had talked to anybody else or other people who supported ISIS, and that she did not know anybody he talked to, in violation of 18 U.S.C. § 1001(a). The statement was false because, as COFFMAN well knew, she previously had put N.A. in contact with ISIS fighters and N.A., in turn, had communicated with them to facilitate N.A.'s travel to Turkey to join ISIS.

1

2. At all times relevant to Count One, COFFMAN was a resident of Glen Allen, Virginia, within the Eastern District of Virginia.

3. This matter relates to an investigation by FBI special agents into illegal conduct by COFFMAN and other individuals suspected of providing material support to a designated foreign terrorist organization, namely ISIS.

## General Facebook Account Activity

4. From prior to June 2014 and continuing up through in or about November 2014, COFFMAN used several Facebook accounts with numerous variations of monikers, to include but not limited to: HEATHER COFFMAN, HEATHER LA'AHAD, HEATHER OBEIDA-LA'AHAD, HEATHER AMETOVA and UBEIDA AMETOVA (collectively referred to below as COFFMAN). The public monitoring of some of COFFMAN'S accounts revealed that she made several postings in which she claimed to be engaged or married to N.A. Investigations have shown a link amongst COFFMAN and several Facebook accounts connected to N.A., who also used different Facebook monikers, including E.M., E.I., and X.F. (collectively referred to below as N.A.).

5. With respect to her own accounts under different monikers, COFFMAN often set her cover pages to reflect her support for the ISIS cause. For example, the defendant established this cover page for one of her accounts:

2



Also, for her Ubeida Ametova account, under "Work and Education" COFFMAN listed "Al-jihadi fi Sabil Allah," which translates as "jihad for Allah's sake."

6. On several of her personal accounts, she posted pictures representing ISIS, jihadist fighters, and related ideals. For example, in June 2014, COFFMAN posted an image of group of armed men, with the "VIRTUES OF THE MUJAHIDEEN" written on it. Also in the picture was a black flag representing ISIS. Written at the bottom was: "Allah has preferred the Mujahideen over those who remain [behind] with a great reward. Degrees from Him and forgiveness and mercy. And Allah is ever Forgiving and Merciful."

### COFFMAN's Efforts to Facilitate N.A.'s Travel to Syria to Fight for ISIS

7. N.A. is a foreign national living outside of the United States. On their Facebook accounts, both COFFMAN and N.A. listed their online Facebook statuses as being engaged or married to one another from at least June 2014 up through September 2014.

8. During the summer months up through September 2014, COFFMAN and N.A. conversed almost daily via Facebook, Skype, and other communications platforms, often spending hours online. A number of their online conversations focused on the ISIS cause and their desires to support the jihadist activities in Syria.

9. During their conversations, COFFMAN and N.A. explored options for N.A. to travel to Syria in order to fight for ISIS and die a "Shaheed." In this context the word "Shaheed" denotes "martyr," and is used as an honorific term for Muslims who have died fulfilling a religious commandment, especially those who die in "jihad." Through N.A.'s death as a martyr, COFFMAN believed that N.A. would secure the couple's place together in the highest level of heaven, Jannah.

10. In or about September 2014, N.A. arranged for COFFMAN to join him and his mother on Skype when they discussed his plans. Although she could not understand the foreign language conversation between N.A. and his mother, COFFMAN understood that N.A. had to get his mother's approval to engage in the martyr plan. After engaging in a debate with her son during which N.A.'s mother got upset, N.A.'s mother walked out. N.A. then told COFFMAN that his mother approved and told him to go. During the same general time period, COFFMAN and N.A. also agreed that after N.A. died a martyr, his associates would send COFFMAN a martyr photo of his body. The defendant, in turn, would then tell N.A.'s parents that their son had died and would share the photo with them.

11. On or about September 4, 2014, COFFMAN contacted A.M., a foreign national who represented himself as a fighter for ISIS in Syria. Through various communications and battlefield photographs provided by A.M., the defendant believed that A.M. was indeed a legitimate ISIS member with the ability to arrange for training and transport of fighters.

12. On or about September 8, 2014, COFFMAN contacted A.M. by text message. COFFMAN explained that she had a "brother" (referring to N.A.) who wanted to travel to Syria to fight for ISIS. COFFMAN asked A.M. whether she could share A.M.'s Facebook contact

information with her friend (N.A.). A.M. consented and told her that N.A. would need "sabr"[1] and that one of A.M.'s associates would "help [N.A.] come in after then he must go training after training the amir say who he must go." COFFMAN lamented that she was supposed to join A.M.

13.     Later on the same day, COFFMAN provided A.M.'s contact information to N.A. via text message. Hours later, COFFMAN and N.A. exchanged additional text messages in which COFFMAN asked, "Have you spoken to those brothers yet?" In this communication, the defendant was referring to A.M. and a second person she had contacted to facilitate N.A.'s travel to Syria to join ISIS. N.A. responded to her question: "Yess [sic]."

14.     Later on or about September 8 and 9, 2014, COFFMAN followed up with A.M to see if N.A. had contacted A.M. and asked if A.M. "put him in the right direction." A.M. confirmed that he received a message from N.A. who stated that he "want to go jihad." A.M. also instructed the defendant to tell N.A. "its not good to talk in facebook so jihad . . . He is not in safe."

15.     In the days after these arrangements were made, COFFMAN and N.A. separated. N.A. decided not to go through with the ISIS travel plans and he backed out.

### Contacts with FBI Undercover Agent (UC) about N.A.'s Proposed Travel

16.     Starting in or about July 2014, an FBI employee, acting in an undercover capacity (hereinafter "UC"), had been in contact with and met COFFMAN. UC had portrayed UC as someone who is knowledgeable on Islam and a likeminded individual, sharing similar views as COFFMAN. UC also portrayed that UC had an associate who shared the same Islamic views and was prepared to travel to Syria to join and fight for ISIS. Over the course of several meetings that

---

[1]     Sabr is the Islamic virtue of "patience" or "endurance."

occurred from September through November 2014, the defendant and the UC had numerous discussions with one another about ISIS and jihadist activities.

17.     During a meeting with the UC on or about September 10, 2014, COFFMAN described how she had previously taken steps to arrange for N.A.'s travel to Turkey, where N.A. would meet with ISIS facilitators. COFFMAN confirmed that those facilitators, in turn, were to arrange for N.A.'s training and travel into Syria in order to join ISIS as a fighter and die a "Shaheed." COFFMAN showed the UC text communications she had saved between the defendant and A.M. regarding N.A.'s proposed travel to Syria. The defendant also explained to the UC how N.A. had provided the "brothers" with the defendant's contact information for use after N.A. died as a Shaheed. The plan was for the brothers to send COFFMAN a martyr photo of him. The defendant, in turn, would then show the picture to N.A.'s parents and tell them of his death. Further, COFFMAN indicated that she was prepared to provide N.A. with money to facilitate his travel to join the ISIS cause.

18.     After her separation from N.A. and the travel plans were cancelled, COFFMAN expressed her frustration to the UC about how N.A. had withdrawn from the ISIS opportunity. On or about October 3, 2014, COFFMAN sent UC a message that stated words to the effect of: "That's whut I told him [referring to N.A.] . . . but now he realizes he is bad and he is the sad one . . . but believe me [UC]. . . . I'm not happy either . . . and he won't go there . . . I gave him every opportunity to go there remember?  I set him up with the brothers who gave him a contact name and number in Turkey to get him across the border when it was time for training . . . I spoke to another brother about it who said he was shocked he [N.A.] is sitting around waiting in Macedonia and he is going to call the emir and fix that and get him to Turkey . . . but my

[Facebook] account was disabled so I couldn't follow through with that. But I think he [N.A.] was just joking us about going."

### COFFMAN Attempts to Facilitate UC's Trip to Syria to Fight for ISIS

19. On or about October 19, 2014, UC shared with COFFMAN that UC's associate wanted to join the fight for ISIS and that they planned to move to the Islamic State. UC also explained to COFFMAN that UC would be travelling overseas in the very near future to visit an ill family member and test the routes into Syria and find a contact to help with crossing the border and joining ISIS. The UC led COFFMAN to believe that he/she was out of the country on this trip up until early November 2014.

20. On or about November 5, 2014, COFFMAN picked the UC up at the Richmond International Airport, and the two drove to a local hotel so they could meet in private. During that recorded meeting, the UC described his/her trip and efforts taken to test the route into Syria to join ISIS. The UC reported finding a good route up to the border of Syria, but lacking the contacts necessary to get them across the Syrian border to join ISIS. The UC asked if the defendant could help him/her and an associate get across the border into Syria with the same facilitator contacts used for N.A. COFFMAN explained that she had not been in touch with her contacts for a while, but agreed to reach out to them after verifying that the facilitator's photos were originals, as opposed to open source photos that had been simply downloaded from the internet.

21. On or about November 5, 2014, COFFMAN sent the following text message to A.M.: "Assalamualaikum warahmatullah wabarakatu akhi . . . in sha Allah you are well. . . . I know a sister and her husband want to come where you are . . . can you help?" COFFMAN

7

later explained to the UC that she (the defendant) was purposefully vague in this message to A.M. so as to avoid law enforcement scrutiny.

22. On or about November 6, 2014, the UC met with COFFMAN at the defendant's personal residence. COFFMAN said she had good news and bad news. The good news was that COFFMAN'S facilitator contact passed her vetting process. COFFMAN also showed the above text message that the defendant had sent to A.M. The bad news was that A.M. had not yet responded. Nonetheless, the defendant explained that the texting platform showed that A.M. had been online as recent as November 3. COFFMAN remained hopeful that she would hear back from the facilitator.

23. On or about November 7, 2014, COFFMAN and another individual met with the UC in a hotel room. COFFMAN reported that she had not heard back from A.M., but would keep an eye out for a response. The defendant was told by the facilitator to make all contacts through the facilitator. Coffman and the UC agreed that the UC compile a list of questions for the facilitator. The UC drafted up a list of questions, focusing on the UC's planned travel to Syria, specific border crossing points, individuals in a position to help UC, and other information. COFFMAN, the UC, and the third individual developed a code word system for the defendant to use in telling the UC of any future response from A.M. COFFMAN told UC that when she makes contact with the facilitator, she would "sneeze" in a text message. The UC, in turn, would acknowledge by saying "Alhamdulillah."

## November 13, 2014 Interview of COFFMAN

24. On November 13, 2014, two FBI special agents interviewed COFFMAN at her place of employment in Glen Allen, Virginia. During the interview, COFFMAN provided false, material information to the federal agents in several areas, including the following:

8

a.  COFFMAN was asked about her knowledge of N.A. and his connections to others who supported ISIS. Specifically, COFFMAN was asked, "Do you, do you know if he [N.A.] talked to anybody else uh, like on Facebook, other people who supported ISIS?" In response, COFFMAN stated, "I have no idea" and "I don't know anybody he talked to." In truth and fact, as COFFMAN well knew, she had provided N.A. with contact information for A.M., who she believed to be an ISIS facilitator in Syria. She knew that N.A. and A.M. had communicated with one another via Facebook and other methods.

b.  COFFMAN also told the FBI special agents that N.A. expressed interest in traveling to join ISIS. She told investigators that "[h]e asked if I know how to get there, I was like (UN) why would I know that." The investigators followed up by confirming that N.A. asked for COFFMAN'S help and asked the defendant again "what did you say?" The defendant responded "I said, how would I know that." In truth and fact, as COFFMAN well knew, she had previously taken steps to arrange for N.A.'s travel to a country bordering Syria, where N.A. would meet with ISIS facilitators. Those facilitators, in turn, were to arrange for N.A.'s training and travel into Syria in order to join ISIS as a fighter and die a "Shaheed," as further described above.

c.  COFFMAN also was asked whether UC supported ISIS or Al-Qaeda. COFFMAN told the FBI special agents "No," and stated that they did not even talk about things like that. COFFMAN was again asked whether the UC had ever expressed an interest in ISIS or terror groups, and COFFMAN again said, "No." COFFMAN further denied that UC had ever expressed interest in traveling to a

country bordering Syria to possibly work in support of ISIS. In truth and fact, as COFFMAN well knew, on November 5, 2014, UC had told COFFMAN about a trip that UC had recently taken to test the route into Syria to join ISIS. As further described in Paragraphs 20 through 23, COFFMAN was also in the process of contacting A.M. on the UC's behalf, with the goal of facilitating UC and UC's associate's travel into Syria to join the ISIS fight.

25. At the end of the interview, FBI special agents told COFFMAN that lying to a federal agent is a crime. COFFMAN then confirmed that everything she had said during the November 13, 2014 interview was true.

26. At the time of making the false statement outlined above in Paragraph 24, COFFMAN knew that her statement to the investigators was false, and she willfully made the statement with the intent of disobeying the law and misleading the investigators. The agents conducting the interview also had official jurisdiction to conduct the ongoing investigation into suspected terrorism activities. The defendant agrees that the statement she made to those agents was material because it directly related to the FBI investigation into the defendant's conduct in putting N.A. and the UC in contact with A.M. and the specific plans she and N.A. made for his travel to join ISIS and die a Shaheed. During all relevant times, COFFMAN believed that A.M. was an ISIS fighter who had the ability to arrange for the UC and N.A.'s training and travel to Syria to join ISIS.

27. COFFMAN agrees that the charged offense involved international terrorism where the charged offense and questions at issue bore directly on the ongoing terrorism investigation into the defendant's knowledge of N.A.'s contact with others supporting ISIS and the steps she had taken to put N.A. (and others) in contact with A.M. in order to arrange for

N.A.'s travel to Syria to join ISIS. At all relevant times, COFFMAN understood that ISIS was engaged in activities that: (a) involved violent acts or acts dangerous to human life that were in violation of the criminal laws of the United States, or that would be a criminal violation if committed within the jurisdiction of the United States; (b) appeared to be intended to intimidate or coerce a civilian population, influence the policy of a government by intimidation or coercion, or to affect the conduct of a government by mass destruction, assassination or kidnapping; and (c) occurred primarily outside the territorial jurisdiction of the United States, or transcended national boundaries in terms of the means by which they are accomplished, the persons they appear intended to intimidate or coerce, or the locale in which their perpetrators operate or seek asylum.

28. COFFMAN committed the offense herein knowingly, voluntarily, and without mistake or accident.

DANA J. BOENTE
United States Attorney

By: *Michael Gill*
Michael R. Gill
Assistant United States Attorney

*Jessica D. Aber*
Jessica D. Aber
Assistant United States Attorney

After consulting with my attorney and pursuant to the plea agreement entered into this day between the defendant, HEATHER ELIZABETH COFFMAN, and the United States, I hereby stipulate that the above Statement of Facts is true and accurate, and that had the matter proceeded to trial, the United States would have proved the same beyond a reasonable doubt.

*[signature]*
HEATHER ELIZABETH COFFMAN
Defendant

I am HEATHER ELIZABETH COFFMAN's attorney. I have carefully reviewed the above Statement of Facts with her. To my knowledge, her decision to stipulate to these facts is an informed and voluntary one.

*[signature]*
Mary E. Maguire, Esq.
Carolyn V. Grady, Esq.
Attorneys for Defendant