IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Case No.: 3:15CR16 |
| | ) | Honorable John A. Gibney, Jr. |
| HEATHER E. COFFMAN, | ) | Sentencing Hearing - May 11, 2015 |
| Defendant. | ) | |

### DEFENDANT'S POSITION ON SENTENCING

The defendant, Heather E. Coffman, by and through counsel, Mary E. Maguire and Carolyn V. Grady, hereby submits her Position on Sentencing. The guidelines classify Ms. Coffman has a Criminal History Category I ("CHC"), with a Total Offense Level of 23, and suggest an advisory sentencing range of 46-57 months. Ms. Coffman has reviewed the pre-sentence report ("PSR") and excluding corrections already submitted to the probation officer, has no objections. Ms. Coffman is requesting that the Court impose a sentence at the low end of the Guidelines based upon the mitigating factors detailed in this position and those outlined in 18 U.S.C. § 3553(a).[1]

### Statement of the Case

From approximately April 2014 to November 2014, the FBI investigated Heather Coffman based upon her posts on various Facebook accounts in which she expressed support for ISIS, jihadist fighters and related ideals. The FBI monitored her Facebook and other on-line

---

[1] As part of the plea agreement in this case the parties "agree to not move forward for an upward or downward departure or variance from the final guideline range determined by the Court at sentencing, except as contemplated by any written agreement between the parties." (PSR ¶ 3).

social media accounts and saw that, starting in June 2014, she claimed to be engaged or married to N.A., who lived in Macedonia. A number of their online conversations focused on the ISIS cause and their desires to support the jihadist activities in Syria.

In September 2014, again through her Facebook accounts, Ms. Coffman made contact with A.M., a foreign national who represented himself as a fighter for ISIS in Syria. Ms. Coffman communicated with A.M. and told him she had someone who wanted to travel to Syria to fight for ISIS. A.M. allowed her to pass on his Facebook account information to N.A. in an effort to facilitate N.A.'s travel to Syria to fight for ISIS. Although Ms. Coffman provided that information to N.A., Ms. Coffman and N.A. ended their relationship days later and N.A. never followed through on his plans to go to Syria.

During the time that Ms. Coffman was communicating with N.A., the FBI sent an undercover agent to make contact with Ms. Coffman and become her friend. The undercover agent posed as someone who shared Ms. Coffman's beliefs about ISIS. As this friendship was developed by the undercover agent, the agent told Coffman that she and her husband wanted to go to Syria and fight for ISIS. In fact, the undercover agent lead Ms. Coffman to believe that she had traveled to Turkey in November of 2014 for a relative's funeral and during the trip had explored routes into Syria. The undercover agent asked Ms. Coffman if she knew anyone who could assist her and her husband in their desire to travel to Syria to fight for ISIS. Ms. Coffman told the undercover agent about her previous contact with A.M. and told the agent that she would send A.M. a message. Ms. Coffman did send the message but it remained unanswered at the time of her arrest.

On November 12 and 13, 2014, two FBI special agents interviewed Ms. Coffman at her place of employment. They told Ms. Coffman that they were there to speak to her about N.A. and his connections to others who supported ISIS. When Ms. Coffman was asked specifically about whether or not N.A. talked to anyone else on Facebook who supported ISIS, she said she had no idea and she claimed to not know anyone else he talked to. This was a false statement. When asked specifically if she assisted N.A. by providing him with information about how he might travel to Syria and fight for ISIS, Ms. Coffman denied that she assisted him in any way. This was a false statement. Ms. Coffman was also asked whether the undercover agent supported ISIS, and she said she (the UC) did not. This was a false statement. At the conclusion of the interview Ms. Coffman was told that lying to a federal agent was a crime. Despite the admonition, Ms. Coffman did not change what she had previously stated to the agents.

The next day, November 14, 2014, a search warrant was executed at Ms. Coffman's home and she was taken into custody and charged with making a false statement to FBI agents involving international terrorism. She has been held in continual custody since that date. Ms. Coffman accepted full responsibility for her conduct in this case during the presentence interview, and even told the probation officer, "I now realize, once I put my head back in reality, that ISIS is not great people." She also shared with the probation that she has come to understand how her behavior has hurt her family and her son and that she wants to "make it right." (PSR ¶ 11).

**Position Regarding 18 U.S.C. § 3553(a)**

After *United States v. Booker*, 543 U.S. 220 (2005), the Federal Sentencing Guidelines are advisory and court of appeals reviews sentences for reasonableness. *See United States v. Hughes*, 401 F.3d 540, 546-47 (4th Cir. 2005). In *Rita v. United States,* 127 S.Ct. 2456 (2007), the Supreme Court stated that a district court should begin all sentencing proceedings by correctly calculating the applicable Guideline range. The Guidelines are not the only consideration, however. The district court must then consider all of the factors listed in § 3553(a) and determine if they support the sentence requested by a party. The approach to sentencing must be a comprehensive one in which the Court fashions a sentence that is sufficient but not greater than necessary to meet the requirements of 18 U.S.C. § 3553. In addition, the Court must consider the individual characteristics of the defendant in fashioning a sentence. *United States v. Carter*, 564 F.3d 325 (4th Cir. 2009).

Although sentencing courts must continue to consider the Guidelines, Congress has *required* federal courts to impose the least amount of imprisonment necessary to account for the considerations and accomplish the sentencing purposes set forth in 18 U.S.C. § 3553(a). These include: (a) the nature and circumstances of the offense and the history and characteristics of the defendant; (b) the kinds of sentences available; (c) the advisory Guidelines range; (d) the need to avoid unwarranted sentencing disparities; (e) the need for restitution; and (f) the need for the sentence to reflect the following: the seriousness of the offense, promotion of respect for the law and just punishment for the offense, provision of adequate deterrence, protection of the public from future crimes and providing the defendant with needed educational or vocational training, medical care, or other correctional treatment. *See* 18 U.S.C. § 3553(a); *see also Kimbrough*, 128

S. Ct. at 570.  In addition, there is no limitation concerning the background, character, and conduct of a person convicted of an offense which a court may receive and consider for the purpose of imposing an appropriate sentence. 18 U.S.C. § 3661.

Because a court must consider the "history and characteristics of the defendant" and the need for the sentence to "provide the defendant with needed vocational training, medical care, or other correction treatment in the most effective manner," 18 U.S.C. 3553 (a), the Court is not free to ignore factors that the Guidelines ignore like education, family and community ties.  The Sentencing Commission itself acknowledges that is not possible to "foresee and capture in a single set of guidelines the vast range of human conduct potentially relevant to a sentencing decision." USSG Ch.1, Pt. A; USSC, *Report to Congress: Downward Departures from the Federal Sentencing Guidelines* 3-4 (2003).

> **A.    18 U.S.C. § 3553(a)(1): The nature and circumstances of the offense and the history and characteristics of the defendant**

The offense for which Ms. Coffman is to be sentenced is making a false statement to federal agents involving international terrorism.  The basis for the charge is found in the following exchange:

> Agent:      Do you, do you know if he [N.A.] talked to anybody else, uh, like on Facebook, other people who supported ISIS?
> COFFMAN:   I have no idea.
> Agent:      Okay
> COFFMAN:   I don't know anybody he talked to.

During this same interview with agents Ms. Coffman was asked about the undercover FBI agent, and these are the pertinent exchanges:

> COFFMAN was asked whether UC supported ISIS or Al-Quaeda.  COFFMAN told the FBI special agents, "we don't talk about things like that."

> COFFMAN was also asked whether the UC "ever expressed any support for ISIS or . . . any terrorist groups or Hammas, and . . . Hezbollah, al-Qa'ida, nothing like that? COFFMAN responded by saying "uh-uh" and shaking her head no. Agents followed up by asking "again, going through the same list of questions, is she in contact with anyone that is?" COFFMAN responded, "not that I'm aware of."

(PSR ¶ 7). The false statements made by Coffman were in an effort to protect the undercover agent, who Coffman thought was a genuine friend, and since she was no longer involved with N.A. she felt it was best not to reveal who he talked to on Facebook. The government knew at the time that these statements were made that they were not true and wasted no efforts in investigating the veracity of her information.

In terms of her character and background, Ms. Coffman grew up in a very protective household where she was isolated from the "real world." (PSR ¶ 32).[2] Ms. Coffman is a thirty (30) years old mother of a son, and with the exception of a short stint in the U.S. Army, she has never lived anywhere but her parents' home. When she wasn't at her workplace, Ms. Coffman was engrossed in her on-line personas, and was an active participant in numerous video games. It was through these activities she developed a strong passion for both video games and social media. The internet became her social outlet, and she even made Facebook pages for her pet rats, because it was fun for her and gave her something to do. (PSR ¶ 44). These activities became her social life and further isolated her from her high school friends and others.

It is evident from a review of her childhood that she embraced various trends and that she has always been attracted to "bad boys." (PSR ¶ 47). The father of her son is evidence of that, as he is described as "verbally abusive," "manipulative, evil and scary." (PSR ¶ 35). Her

---

[2] Given what happened to Ms. Coffman's mother, she tried to "protect" Heather which translated into not allowing her to do anything. As such, Heather had few friends and rarely engaged in social activities outside the home.

grandmother describes her as a "thrill seeking kid - always looking for something different." (Attachment). Through people she met in her on-line world, Ms. Coffman began to become interested in ISIS. Sadly, she became radicalized through these relations, and enjoyed the attention she received from posting provocative things on Facebook. Due to the reactions of Facebook administrators to her postings, Ms. Coffman became engaged in a cat and mouse game with Facebook, as she would open new accounts under different variations of her name[3] and post pro-jihadist and pro-ISIS statements and see how quickly it would get shut-down. This "censorship" by Facebook made her even more dedicated to the cause of spreading the word about ISIS[4].

     A review of recent news reports and analysis reveals that ISIS is filling an obvious void on social media with their concerted propaganda campaign to instill fear, spread misinformation and beguile gullible individuals to believe that they are soldiers of God. As was noted in a recent NBC News article, "ISIS uses social media in the same way extremist groups included in Nigeria's Boko Haram and Somalia's Al-Shabaab do - to control the narrative, boost morale, attract new supporters and demoralize their enemies."[5] A recent paper published by the Brookings Institute reflects the success of the ISIS social media campaign. The authors analyzed a sample of 20,000 ISIS-supporting Twitter accounts. The authors were able to map the locations, preferred languages, and the number and type of followers of these accounts. The

---

[3] This activity accounts for some of her alias names listed on page 2 of the PSR.

[4] The fact that her parents did not share her sentiments for ISIS and became angry with her even for mentioning it around them made it almost more attractive for her, like a teenager defying their parents, and persisting in doing that which is forbidden.

[5] *Why ISIS' Social Media Campaign is 'Even More Brutal' Than Most* - NBC News (June 116, 2014).

study found that almost one in five ISIS supporters selected English as their primary language when using twitter, and that the United States had the fourth highest number of users.[6] ISIS seems to be targeting young people who need a way to vent their anger and frustration, and want to be included in something "meaningful." The social media machine ensnared Ms. Coffman, and she came to believe that ISIS fighters were soldiers for God. As demonstrated by her statement to the probation officer, she has recoiled from that belief.

Ms. Coffman's text and on-line chats provided in discovery shows her complete naivety when it comes to terrorist activity. In a Facebook exchange with an ISIS facilitator to help her then fiancee N.A. join ISIS, Heather asked "will he be with you or what? How does that work?" Despite what she says in other posts, she has a total lack of understanding about the whole process of what it truly means to join ISIS and fight. In another exchange concerning her fiancé N.A. joining ISIS she says, "I kind of want him to be safe lol." (PSR ¶7). She truly did not appreciate the seriousness of her behavior, or the actually consequences of fighting for ISIS.

This naivety is further reflected in her relationship with N.A., a young man she met on-line and almost immediately began calling him her fiancé or husband. Although the two of them never met, they engaged in a world-wind on-line romance that lasted from June 2014 to September 2014. They shared no common language, customs or culture, but both espoused the virtues of ISIS and a desire to join the cause. To them this commonality meant they were in love. It was during this time frame that Ms. Coffman became of interest to the FBI. In her efforts to support and please the man she thought would one day be her husband, Ms. Coffman sent

---

[6] J.M. Berger and Jonathan Morgan, *The ISIS Twitter Census: Defining and Describing the Population of ISIS Supporters on Twitter*, (Brookings Institute: March 2015).

approximately $1,500 to N.A. for personal and family expenses, which depleted her financially. (PSR ¶ 7). Due to her dedicated support to her fiancé, Ms. Coffman even reached out on the internet and made contact with someone who said they were a facilitator with ISIS and asked if N.A. could contact them and join the fight. This was all done on Facebook as Ms. Coffman had no other concrete connections with ISIS.

The behavior that constitutes the essence of this crime reflects a young, naive woman who got caught up in a cause and acted and spoke without appreciating the seriousness of her actions and its grave implications. Since being incarcerated she has had time to reflect on her behavior and realizes that she got caught up in a cause that she didn't really understand. The fact that it was a group that most Americans and her parents abhor made her more drawn to it, like forbidden fruit. Since she had experienced such a protected and isolated social life, she was attracted to things considered "off-limits." In the height of her relationship with N.A. she would open up a skype line with him and keep it open on her phone almost all day. She did all of her communications using her phone, which just became an extension of herself. She withdrew from friends and spent all of her free time on-line. Her entire social life existed through her social media connections, with the exception of the undercover FBI agent. She became obsessed with ISIS like she had become obsessed with the preppy and goth trends. (PSR ¶44). Ms. Coffman's only "real friend" was the undercover agent, as she was one of the only people who Ms. Coffman socialized with in person outside of her immediate family.

When Ms. Coffman was not on-line she was caring for her son, or working. Her PSR shows that Ms. Coffman has worked her entire adult life. Upon earning her GED she joined the U.S. Army, and when she returned home in 2004, she worked as a sales associate. Ms. Coffman

was clearly a hard and honest worker as she had the same employer for the ten years prior to her arrest in this case. (PSR ¶ 48). As her sister notes, she was a valued worker and often her co-workers would call her on her day off if they needed help with something at the store. (Attachments). Ms. Coffman was always willing to help.

B.     18 U.S.C. § 3553(a)(2):  The Need for the Sentence Imposed

Section 3553(a)(2)(A) requires a sentencing court to impose a sentence that reflects the seriousness of the offense, promotes respect for the law, and provides just punishment. The calculated sentencing guideline range in this case is 46-57 months. The PSR correctly outlines Ms. Coffman's lack of any prior criminal conduct, the only thing she had ever been convicted of before this case was a reckless driving charge. The difference at this juncture in her life is that Ms. Coffman realizes that she went too far, and got too caught up in a serious global issue. Ms. Coffman believes that she could benefit from counseling, perhaps some anger management and something that would help her control her impulsive behavior. She has self-diagnosed herself with Attention Deficit Hyperactivity Disorder and Obsessive-Compulsive Disorder. She also suffers from Misophonia which is a hatred for noise. She told the probation officer that she would like to attend counseling so that she can "get some help in trying to figure out" her past and put her life together. (PSR ¶ 43).

Ms. Coffman has learned very valuable lessons from her mistakes and lack of judgement. She also realized that her family and her son need to come first. More importantly, she recognizes that it is now time for her take positive steps toward her own self-improvement. Ms. Coffman freely accepted responsibility for this offense when she was interviewed by the U.S. Probation Officer and told the probation officer that she realizes her mistakes have affected her

family and her son. She stated that she wants to "make it right." (PSR ¶11). Her family believes that she has "learned her lesson." (Attachment). Her family members are dedicated to Ms. Coffman and her mother states, "we are doing all we possibly can to ensure the healthiest pro-social environment possible upon Heather's return." (Attachment). Her father pledges that "this will not happen again." (Attachment). With her commitment and her family's help, Ms. Coffman will not be back before the Court for any reason and will continue being the productive citizen she was, working and caring for her son, before she was arrested in this case.

A sentence of active incarceration is called for by the guidelines in this case. The question for the Court is just how much time is necessary. A sentence at the low end of the guidelines, 46 months, will serve to promote respect for the law, provide adequate deterrence, and protect to the public, while permitting Ms. Coffman to continue along her path of self-improvement and rehabilitation without interruption. A term of 46 months will also provide adequate punishment for someone never previously incarcerated. This sentence will also protect society which was never in any real danger from Ms. Coffman's lies.

## CONCLUSION

The factors of 18 U.S.C. § 3553(a) require that this Court impose a sentence that is not greater than necessary after consideration of all of the factors therein. After consideration of 18 U.S.C. § 3553(a), and all the factors present in this case, Ms. Coffman requests the Court impose of sentence of no more than 46 months.

                                                Respectfully submitted,
                                                HEATHER ELIZABETH COFFMAN

                          By:       /s/
                                    Counsel

Mary E. Maguire, Esq.
Va. Bar # 42505
Carolyn V. Grady, Esq.
Va. Bar #30445
Office of the Federal Public Defender
701 E. Broad Street, Suite 3600
Richmond, VA   23219
(804) 565-0860
(804) 648-5033 (fax)
Mary_Maguire@fd.org

**CERTIFICATE OF SERVICE**

I hereby certify that on April 27, 2015, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send a notification of such filing (NEF) to the following:  Michael Gill and Jessica Aber,  Assistant United States Attorneys, U.S. Attorney's Office, 600 E. Main Street, Suite 1800, Richmond, VA 23219, Mike.Gill@usdoj.gov, Jessica.Aber@usdoj.gov.

/s/
Counsel

Mary E. Maguire, Esq.
Va. Bar # 42505
Carolyn V. Grady, Esq.
Va Bar # 30445
Assistant Federal Public Defenders
Office of the Federal Public Defender
701 E. Broad Street, Suite 3600
Richmond, VA   23219
(804) 565-0860
(804) 648-5033 (fax)
Mary_Maguire@fd.org