IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

Richmond Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Criminal No. 3:15CR16 (JAG) |
| | ) | |
| HEATHER ELIZABETH COFFMAN, | ) | |
| | ) | |
| Defendant. | ) | |

**POSITION OF THE UNITED STATES ON SENTENCING**

The United States of America, by and through its attorneys, Dana J. Boente, United States Attorney, and Michael R. Gill and Jessica D. Aber, Assistant United States Attorneys, files this Position on Sentencing as follows:

**I.    Background**

The defendant was arrested on a criminal complaint alleging False Statement Involving International Terrorism, in violation of 18 U.S.C. § 1001(a), on November 14, 2014. She has been detained since the time of her arrest. The defendant subsequently waived indictment and pleaded guilty to a one-count criminal information alleging the same offense on November 13, 2014. Presentence Report (hereinafter "PSR") ¶¶ 1-3. In the plea agreement, the parties agreed to recommend certain guideline factors and that neither party will seek a departure or variance from the final sentencing guideline range. PSR ¶ 3.

1

## II.   Sentencing Calculations

As detailed in the PSR, the defendant has a 2010 conviction for Reckless Driving, for which she received a sentence of 90 days with 75 days suspended.   PSR ¶ 25.   She received only one point for that conviction, placing her in a Criminal History Category I.   PSR ¶ 25.

The defendant's base offense level under U.S.S.G. § 2J1.2 is 14, with an additional 12 points added because the offense related to international terrorism under U.S.S.G. § 2J1.2(b)(1)(C).   PSR ¶¶ 14-15.   Following full acceptance of responsibility credit, the defendant's adjusted offense level is 23, yielding an advisory guideline range of 46-57 months. PSR ¶¶ 21-22.   For the reasons explained below, the United States respectfully requests that this Court sentence COFFMAN to 57 months imprisonment.

## III.   Position on Sentencing

The parties have agreed not seek a departure or variance outside of the 46-57 month advisory guideline range.   Taking into account the defendant's background and the underlying facts in this case, the United States believes a guidelines sentence of 57 months is warranted under the applicable 18 U.S.C. § 3553(a) factors.

### 1.   The Nature and Circumstances of the Offense (18 U.S.C. § 3553(a)(1)):

Although the criminal charge in this case focuses on COFFMAN'S false statements to federal agents just before her arrest, the roots of her criminal conduct stretch back several months to when she started an extreme and rapid spiral into supporting ISIS and the organization's violent agenda.   All evidence suggests that—but for timely Government intervention—the defendant was destined for more substantial, potentially violent conduct.

As outlined in the Statement of Facts and PSR, COFFMAN used the internet to post jihadist materials, publicly proclaim her support for ISIS,[1] and encourage others to fight for ISIS. PSR ¶¶ 6-7. The defendant began a radicalization path in early 2014 and, by the summer of 2014, she was actively exploring avenues to support ISIS operations in the Middle East. Aside from splashing pro-ISIS propaganda around her social media outlets, the defendant affirmatively crossed over the line from merely expressing her personal beliefs into actual criminal conduct designed to support the ISIS violent agenda. Her efforts included establishing ties with actual ISIS facilitators and connecting others with those contacts to facilitate their travel to the Middle East to join ISIS.

The defendant's criminal conduct was anchored in her social media efforts, which allowed her to establish contacts around the world.[2] The defendant's online activities were neither casual nor infrequent. Her online presence was significant. She had at least 10 separate Facebook accounts with male and female pseudonyms and each time Facebook terminated an account for violating the terms of service, she created a new one. PSR ¶ 7 (page 11). COFFMAN's

---

[1] On October 15, 2004, the United States Secretary of State designated al-Qa'ida in Iraq (AQI), then known as Jam'at al Tawhid wa'al-Jihad, as a Foreign Terrorist Organization ("FTO") under Section 219 of the Immigration and Nationality Act and as a Specially Designated Global Terrorist under section 1(b) of Executive Order 13224. On May 15, 2014, the Secretary of State amended the designation of al-Qa'ida in Iraq ("AQI") as a FTO under Section 219 of the Immigration and Nationality Act and as a Specially Designated Global Terrorist entity under section 1(b) of Executive Order 13224 to add the alias Islamic State of Iraq and the Levant ("ISIL") as its primary name. The Secretary also added the following aliases to the ISIL listing: the Islamic State of Iraq and al-Sham ("ISIS"), the Islamic State of Iraq and Syria ("ISIS"), ad-Dawla al-Islamiyya fi al-'Iraq wa-sh-Sham, Daesh, Dawla al Islamiya, and Al-Furqan Establishment for Media Production. ISIS or ISIL remains a designated foreign terrorist organization.

[2] Aside from acting through her own accounts, the PSR describes COFFMAN'S use of another Facebook method that allowed her to contact several self-proclaimed jihadists and ISIS supporters. PSR ¶ 7. Those methods will not be discussed or disclosed in this public filing.

comments were not placid, religious sentiments. Rather, she engaged in online conversations with fellow jihadists worldwide that included violent rhetoric like the following:

- During a conversation on October 13, 2014, the defendant described how she used Facebook "to spread the truth about ISIS . . . al qaeda . .. the Taliban . . . and the truth to how the us military teaches and trains their cowards to hate Muslims and kill innocents . . ." She also remarked that "I've gotten a lot of people to see the truth . . . to see the good of ISIS and the bad of the us military" and "[s]lowly but surely there will be enough people with ISIS to wipe out the us military in sha Allah." PSR ¶ 7 (page 12).

- On November 10, 2014 (just four days before her arrest), COFFMAN asked an 18 year-old male what he thought about suicide bombing. During the conversation, the defendant expressed her opinion that "[Suicide bombing is the] highest and best type of martyrdom" and later remarked that she believes it is her destiny. COFFMAN also stated she would use the tactic against "[a]nyone against Islam. . . . I wouldn't go blow myself up here in the us because the battle isn't here . . but if I'm there the us army is there then Yes." PSR ¶ 7 (page 12).

- Regarding U.S troops in Iraq, COFFMAN wrote, "let isis kill them." PSR ¶ 7 (page 12).

Aside from Facebook, the defendant also communicated with her jihadist contacts (including facilitator A.M.) by text message over different platforms using actual phone numbers. Through those avenues, she obtained violent ISIS propaganda, photographs and videos emphasizing the violence of the group that she chose to support.

And COFFMAN's online activities were not mere fantasy or role-playing. The defendant took concrete steps to lend support to ISIS. She had an online, romantic relationship with N.A., a foreign national. PSR ¶ 6. From the summer up through September 2014, the couple had extensive on-line conversations, many of which centered on their affinity for ISIS and jihadist causes. That path is what ultimately led to the couple's plan for N.A. to join ISIS and die a martyr. By dying as a martyr, both the defendant and N.A. believed that he would secure their place together in the highest level of heaven, Jannah.

COFFMAN actively encouraged N.A.'s martyrdom plan, helped him work out the logistics and put him in contact with actual ISIS facilitators that she believed to be operating in Syria. She affirmatively followed up with both N.A. and facilitator A.M. to make sure the two were in contact and that the plan was moving forward – a plan involving N.A.'s travel to Turkey for training with ISIS (with the defendant's financial assistance for travel) and crossing the border into Syria to join the fight. The reality of the defendant's martyr plan was highlighted with an exclamation point when she joined N.A. on a Skype call during which he obtained his mother's approval for the suicide operation. The defendant observed N.A.'s mother get upset during the traumatic conversation, but ultimately agreed to her son's plans. She also agreed to take an extraordinary step after N.A.'s death that illustrated her full knowledge that N.A. fully intended to die for ISIS. After N.A.'s death as a martyr, his associates would send the defendant a martyr photo of his body. She, in turn, would tell N.A.'s parents of his death and would even share the "martyr" photo with them.

The martyrdom plan was moving forward when the couple's relationship deteriorated in early September 2014, and N.A. backed out of the plans. COFFMAN communicated her

disappointment that N.A.'s martyr plans had failed. Among other similar communications, in October 2014, she sent the following message:

> [N.A.] keeps saying he wants to be a muhahid and go to Syria . . . me . . . a girl in America . . throw out my neck and got him into contact with 4 different brothers from ISIS so he could go to them . . . I gave him the money for a plane ticket to get to Turkey so he could cross the border into Syria . . . I paved the path to Syria for him . . . and he turned away from it and decided to chase the fitnah of women.

PSR ¶ 7 (page 17). On November 3, 2014, she complained to another jihadist contact and acknowledged that her conduct could land her in trouble with authorities:

> I set [N.A.] up with ISIS . . and he didn't go!!!!! . . . His intention was to go be a Shaheed[3] . . . and I was OK with that . . . I would have met him in jannah . . . but he didn't go (angry) . . .
>
> I am mad because I went out for [N.A.] and got in contact with our brothers with ISIS in Syria . . . got him hooked up with them for him to go . . . I could get into a lot of trouble for that . . . and he decided to chase fitnah and the pleasures of this dunya.

PSR ¶ 7 (page 17).

To investigate COFFMAN's criminal conduct and intentions, the FBI introduced an undercover agent (U.C.) to her. PSR ¶ 6. Through a number of meetings, the defendant affirmed her devotion to the ISIS cause, detailed her plans for N.A.'s suicide mission, and later offered her assistance to help the U.C. travel to Syria to join ISIS. PSR ¶ 6. In early November 2014, the U.C. met with Coffman in Richmond after the U.C.'s supposed travel to Turkey. During face-to-face meetings on November 5-7, 2014, the defendant answered the U.C.'s request for assistance by trying to establish contact with A.M. for travel arrangements. The defendant also demonstrated for the U.C. how she confirmed the facilitator's legitimacy by conducting computer searches showing that A.M.'s photos were originals, as opposed to open source photos that had

---

[3] The term "Shaheed" denotes a "martyr" and is used as an honorific for Muslims who have died wielding jihad.

been simply downloaded from the internet.   To avoid law enforcement scrutiny, the defendant described how she sent a purposefully vague message to A.M.   Further acknowledging the criminality of her actions, COFFMAN and the undercover agent developed a code word system to use when reporting any response from the ISIS fighter.   PSR ¶ 6.

In order to secure evidence on the defendant's phone and to address her escalating violent communications with others, FBI agents executed search warrants and interviewed the defendant on November 12 and 13, 2014.   COFFMAN's lies to law enforcement further reflect her knowledge that her efforts to help ISIS were unlawful.   She falsely denied knowing that N.A. had talked to anyone who supported ISIS, denied knowing that N.A. had an interest in joining ISIS, and denied knowing that the undercover agent claimed to support ISIS.   PSR ¶ 6.

Following her arrest on November 14, 2014, the defendant admitted that she had actually told N.A. that she could help him travel to Syria and that she had provided him with contact information for facilitators, including A.M.   She also confirmed that one of the facilitators had been in contact with N.A. following her efforts.   The defendant also confessed to reaching out to A.M. on the U.C.'s behalf, but that she had not received a response.   She also claimed that the U.C. and her husband did not express an interest in going to Syria to fight for ISIS, which was directly contradicted by the undercover recordings.

Overall, the underlying offense conduct reflects COFFMAN'S deep immersion in the ISIS cause and several concrete steps she had taken to facilitate N.A. and the U.C.'s efforts to join the violent organization in Syria.   When confronted by law enforcement prior to her arrest, she covered up those concrete steps and concealed evidence that was material to an ongoing terrorism

investigation. The defendant's criminal conduct needs to be addressed with a significant sentence.

2.   **The History and Characteristics of the Defendant (18 U.S.C. § 3553(a)(1)):**

The defendant was fortunate to have a stable upbringing, far better than most defendants who appear before this Court. At the time of the offense conduct, COFFMAN was living with her parents and sister in Henrico, Virginia. Her parents provided her with support and the defendant reported that she had a good childhood with her parents providing "care, guidance and love." PSR ¶ 32.

The defendant had difficulty finishing high school, but received her GED in 2003. She then enlisted in the U.S. Army and attended Basic Training for approximately four months before her discharge. COFFMAN admitted to facilitating her discharge by cutting her arm intentionally to "speed up the process of getting out." PSR ¶ 33. Although the defendant later claimed to the U.C. and others in 2014 that she wanted out of the Army after realizing she have to fight against Muslim brothers, Army records reflect that the defendant forced her discharge due to her failure to adjust to military service. PSR ¶ 33.

The defendant has never been married. She has a seven year-old son from a prior relationship. The child was living with the defendant at the time of the offense conduct, and has since moved in with his father. PSR ¶ 35. She maintained employment before and during the offense conduct, but was still dependent on her family for financial support and housing. Her mental health history is concerning, and she claims to have "self-diagnosed" herself with different disorders. PSR ¶ 43. Her criminal record includes only one conviction in 2010 for Reckless Driving, for which she received a 90 day sentence with 75 days suspended. PSR ¶ 25.

The defendant's conduct after being confronted with this prosecution merits consideration. Soon after meeting with the prosecution team, the defendant decided to accept full responsibility for her conduct and waived detention in this case. She has been cooperative in discussing her own criminal conduct and expresses remorse for her support for ISIS and related criminal conduct that led to her arrest. She also saved the government significant resources by pleading guilty. Her decision to quickly accept responsibility has been accounted for by the guideline calculations and her prosecution for the instant offense in lieu of other charges that would have carried significantly higher sentencing ranges. The United States hopes that she continues on that law-abiding path and becomes a productive member of society in the years to come.

3. **The Need for the Sentence Imposed to Reflect the Seriousness of the Offense, to Afford Adequate Deterrence, and to Protect the Public (18 U.S.C. § 3553(a)(2)):**

For the reasons explained above, the United States believes this is an extremely serious offense where the defendant aligned herself with an extremely violent terrorist organization and tried to facilitate others' attempts to join the ISIS fight in Syria. That organization's connection to the criminal conduct in this case is very serious and highlights the need for a significant sentence. Over the past several months, the world has witnessed the spread of ISIS and the extreme violence that has become the hallmark of the organization's deadly agenda. While world leaders address the ISIS problem, criminal cases involving defendants' attempts to join and assist the jihad must be prosecuted and addressed with significant sentences. For obvious reasons, a strong guidelines sentence is necessary to address the criminal conduct at the heart of this case.

In a similar vein, a strong message of deterrence needs to be sent to anyone planning on engaging in conduct geared towards supporting the ISIS agenda and thwarting law enforcement

efforts to investigate and address the criminal conduct.   COFFMAN exemplifies the frontlines of the current United States counterterrorism efforts.   ISIS and other terrorist groups "are strategic about using women."   Jayne Huckerby, *When Women Become Terrorists*, N.Y. TIMES (Jan. 21, 2015).   Almost every day, the media reports on various American and European who decide to leave their homes and travel to foreign lands to air terrorists.   "ISIS has been on a very strong female recruitment drive, and women are joining ISIS for a variety of reasons, many of which are the same as men," Jayne Huckerby, Director of the Duke International Human Rights Clinic, told ABC News in January.   *See* Ferran Lee and Randy Kreider, *Selling the "Fantasy": Why Young Western Women Would Join ISIS*, ABCnews.com (Feb. 20, 2015); *see also* Katie Zavadski, *Meet the Female Recruiters of ISIS*, NEW YORK MAGAZINE (Sept. 4, 2014).   COFFMAN is not an outlier.   Other women must be deterred from helping terrorist groups via the internet.   A maximum sentence of 57 months will send a strong message to anyone engaging in similar conduct that is designed to assist ISIS.   Such a sentence will also emphasize law enforcement's commitment to aggressively pursue these crimes and highlight that offenders will go to prison.

   Finally, the requested sentence is necessary to protect the public from the defendant. Although she has expressed remorse and appears dedicated to turning away from ISIS and for what it stands, the defendant needs a significant sentence to address her conduct and allow for her rehabilitation from the jihadist path she was pursuing in 2014.

4. **The Kinds of Sentences Available, the Applicable Sentencing Range, and the Need to Avoid Unwarranted Sentence Disparities Among Similarly-Situated Defendants (18 U.S.C. § 3553(a)(3)-(4) and (6)):**

The proposed sentence of 57 months takes into account all of the factors outlined in 18 U.S.C. § 3553(a), COFFMAN'S background, and the offense characteristics described in the prior sections. Such a sentence will also allow the defendant to continue the rehabilitation path, taking full advantage of the programs offered by the Bureau of Prisons.

For all of the above reasons, the United States respectfully asks this Court to sentence COFFMAN to 57 months imprisonment.

Respectfully submitted,

DANA J. BOENTE
UNITED STATES ATTORNEY

_____/s/_____
Michael R. Gill
Jessica D. Aber
Assistant United States Attorneys
Attorneys for the United States
United States Attorney's Office
600 East Main Street, Suite 1800
Richmond, Virginia 23219
Phone: 804/819-5400
Fax: 804/771-2316
Email: mike.gill@usdoj.gov
            jessica.d.aber@usdoj.gov

**CERTIFICATE OF SERVICE**

I hereby certify that on the 27th day of April, 2015, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send a notification to the following:

| | |
|---|---|
| Mary Maguire | Carolyn Grady |
| Office of the Federal Public Defender | Office of the Federal Public Defender |
| 701 E Broad Street, Suite 3600 | 701 E Broad Street, Suite 3600 |
| Richmond, VA 23219 | Richmond, VA 23219 |
| Email: Mary_Maguire@fd.org | Email: Carolyn_Grady@fd.org |

/s/
Michael R. Gill
Jessica D. Aber
Assistant United States Attorneys
Attorneys for the United States